[Cite as *State v. Lewis*, 2021-Ohio-2313.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | No. 109937 |
| v. | : | |
| BOBBY LEWIS, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 8, 2021

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-649116-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Poula Hanna, Assistant Prosecuting Attorney, *for appellee.*

Susan J. Moran, *for appellant.*

MARY J. BOYLE, A.J.:

{¶ 1} Defendant-appellant, Bobby Lewis, appeals his convictions. He raises two assignments of error for our review:

1. The trial court erred by denying appellant's motion for acquittal pursuant to Crim.R. 29 when the state failed to submit sufficient evidence of appellant's complicity.

2. Appellant's convictions are against the manifest weight of the evidence.

{¶ 2} Finding no merit to his assigned errors, we affirm.

## I. Procedural History and Facts

{¶ 3} In March 2020, Lewis was indicted on eight counts: Count 1, aggravated robbery in violation of R.C. 2911.01(A)(1), a first-degree felony; Counts 2 and 3, robbery in violation of R.C. 2911.02(A)(2) and (3), second- and third-degree felonies; Counts 4 and 5, having weapons while under disability in violation of R.C. 2923.12(A)(2) and (3), third-degree felonies; Count 6, theft in violation of R.C. 2913.02(A)(1), a fifth-degree felony; Count 7, identity fraud in violation of R.C. 2913.49(B)(2), a fifth-degree felony; and Count 8, telecommunications fraud in violation of R.C. 2913.05(A), a fifth-degree felony. Counts 1 and 2 contained one- and three-year firearm, notice of prior conviction, and repeat violent offender specifications, and Count 3 contained one- and three-year firearm specifications. Lewis pleaded not guilty to all charges and waived his right to a jury trial. The following evidence was presented to the bench.

{¶ 4} Maritza Rosa testified that on the night of January 4, 2020, she and her husband had gone to a police charity event in "the Ohio City area" in Cleveland. After the event, they were going to meet some family members at a local bar around West 50th and Detroit Avenue, but she and her husband got into an argument on the way there. She asked her husband to "stop the car" so she could walk home. She

stated that they were about 10 minutes from their house at that point and she believed it was "around midnight" when she got out of the car.

{¶ 5} Rosa testified that as she was walking past the Michael J. Zone Recreation Center ("Zone Rec Center") on Lorain Road, she noticed a silver Dodge Avenger pull into the parking lot. She thought that it was odd that someone was going into the park "at such a late hour." She noticed that the Dodge had temporary tags on it.

{¶ 6} As Rosa continued to walk, she felt a gun to the back of her head. The perpetrator said, "Give me your purse, bitch." She turned around, and "the gun was then pointed to [her] mouth." The gun reminded her of a police officer's gun; it was black with a silver barrel and was "pretty large" and "bulky." She said that her uncle is a Cleveland police officer, so she was familiar with police guns.

{¶ 7} Rosa stated that the perpetrator was a male wearing a "white hoodie" but he had it pulled "really tight" over his head so she could not see his face very well. She described him as tall and "pretty slim." She told police that he was either "a light-skinned black man or possibly a Hispanic male." She noticed that the driver's side door of the silver car was open, although she admitted that she did not see what side of the vehicle he came from or went to. She also did not see if anyone else was in the car. She could not identify Lewis before trial or in court.

{¶ 8} Rosa stated that the man took her wallet and pushed her. As he began to walk back towards the silver car, she pulled her cell phone out of her pocket to

attempt to take a photo of the license plate. The perpetrator saw her trying to do so, however, and came back, "snatched" her phone, and hit her. She fell to the ground.

{¶ 9} Rosa testified that she blacked out for some time after she fell to the ground. When she woke up, she continued walking home. But when she felt blood on the back of her head, she waived a car down and asked the driver to take her somewhere safe. He drove her to a gas station nearby where he called 911 at 1:00 a.m. She was taken by ambulance to the hospital.

{¶ 10} After she left the hospital, she locked her iPhone and turned on the "location services in an attempt to figure out where [her] phone was." She stated that it was "pinging off of Western Avenue" between three homes. She also contacted her credit card companies because she had been getting alerts that someone had been using her credit cards. She found out where her cards had been used as well as the dollar amounts. She created a spreadsheet of the information and gave it to a detective. She said that her credit cards had been used at multiple gas stations and for an online order at Finish Line.

{¶ 11} Officer Joseph Matt of the Cleveland Police Department testified that he arrived at the gas station after he received reports of a robbery. He said that Rosa was already in the ambulance when he arrived. The state played his body camera footage from that evening. In the video, Rosa described the male and his gun to Officer Matt. He relayed the information over the police radio.

{¶ 12} Sergeant Timothy Hassing of the RTA Police Department testified that on the night of January 31, 2020, he was on routine patrol with another sergeant

in an unmarked vehicle at a rapid station at the corner of West 98th Street and Detroit Avenue. He said that he and his partner observed three males "cross over from Detroit Avenue and wait at the front of the station" but they were "not utilizing RTA services." They then saw a "silver passenger car come into the bus lane," pick up the males, and then attempt to do a U-turn in the bus-only traffic area. The vehicle then "attempted to exit the entrance only," but turned around and exited through a "bus-only exit rather than using the parking lot."

{¶ 13} Sergeant Hassing began to follow the vehicle. He noticed that the car had a temporary tag on it that was blank. He and his partner initiated a traffic stop. They approached the passenger side of the vehicle and spoke to the driver. They noticed "several indicators," including that the men were "sweating profusely" and "tremoring." They ordered the back-seat passengers to put their hands on the back of the front seats.

{¶ 14} Sergeant Hassing asked the driver if he had a valid driver's license, and the driver said he did not. Sergeant Hassing then asked the driver to step out of the car. The driver had a state identification card on him, but it was not valid either. Sergeant Hassing learned that Lewis was the driver. Lewis told him that the car belonged to his girlfriend.

{¶ 15} Sergeant Hassing stated that they were going to tow the vehicle because Lewis did not have a driver's license. They asked the other passengers to get out of the vehicle and "*Terry*-patt[ed] them down for weapons." One of the rear passengers had a gun in his front coat pocket.

{¶ 16} Sergeant Hassing stated that he learned from another police officer that there was "an aggravated robbery BOLO for a silver Avenger with rear quarter panel damage," which matched the vehicle that Lewis had been driving. Sergeant Hassing explained that "BOLO" meant "be on the lookout for."

{¶ 17} Detective Courtney Evans of the Cleveland Police Department's "major crimes" unit testified that she was assigned to this case on January 31, 2020, after she received a call from RTA police that they had a suspect vehicle that matched a BOLO from her district. She reviewed the BOLO and the suspect vehicle and determined that they matched. She reviewed the case file from a previous detective and learned that there were already surveillance videos from two gas stations where the victim's credit cards had been used as well as from the Zone Rec Center.

{¶ 18} Detective Evans identified photos of "snippet[s]" taken from the rec center's surveillance videos. The photos were time stamped a few seconds different at 12:52 a.m. on January 5, 2020. Detective Evans stated that the still photos were taken from the videos as the car drove into the parking lot of the rec center, turned around, and then exited the parking lot. One photo portrayed a silver or "lighter-colored car" leaving the parking lot that showed the car had "damage to the passenger side rear quarter panel." Detective Evans explained that some of the photos from the video showed only two people in the car because the photo shows the front of the vehicle as it faced the camera. But Detective Evans stated that in one of the photos, which showed the entire passenger side of the vehicle, there appeared to be a third person sitting in the back seat who was wearing red. She further

testified that from still photos, the front-seat passenger appeared to be wearing "white with some dark colors on it," and the driver appeared to be wearing light gray or white or a "lighter-colored solid color."

{¶ 19} Detective Evans then reviewed the actual surveillance videos from the rec center in court. The still photos from the videos reflected what the videos portrayed.

{¶ 20} Detective Evans stated after she took over the case, she had the silver Dodge towed to a police lot. She obtained written consent from the owner of the vehicle to search it. She found mail in the vehicle addressed to Lewis on Harvard Avenue in Cleveland, which she later learned is where Lewis lived.

{¶ 21} Detective Evans stated that a previous detective had also obtained "cell phone pings" from the victim's cell phone that had been stolen. The stolen cell phone had "pinged" in the area of "114th and Western" Avenue, in Cleveland. Detective Evans said that Desmond Franklin lived on Western Avenue. Based on her investigation, she believed that Franklin was in the passenger seat of the silver Dodge on the night of the aggravated robbery.

{¶ 22} Detective Evans testified that she reviewed the other surveillance videos that were in the file from places where the victim's credit cards had been used, including a BP on Lorain Avenue and "Henry's," which is a gas station or convenience store on Fulton Road. The videos were played in court. The video from the BP shows the gas station clerk and a customer who Detective Evans identified as Desmond Franklin. Franklin was wearing a Nike windbreaker that was black on top,

had blue sleeves, and was white from the chest down.  Detective Evans stated that the jacket appeared to match what the passenger in the silver car was wearing in the rec center videos.  Franklin can be seen in the BP video paying for items with the victim's credit card, receiving the items, and walking out of the gas station.  Detective Evans "put out a warrant for receiving stolen property" and interviewed Franklin after he was arrested.

{¶ 23} Detective Evans also reviewed the surveillance video from Henry's. The video shows a woman using the victim's credit card, but Detective Evans was never able to identify the woman.

{¶ 24} Detective Evans testified that the victim's credit card was also used about one hour after the robbery for online purchases at Finish Line by someone using an email address, "franko-something@gmail.com."  One of the online purchases was supposed to be delivered to Lewis's address on Harvard Avenue, and the other online purchase was supposed to be delivered to Franklin's address on Western Avenue.

{¶ 25} Detective Evans first interviewed Lewis at the police station on the night that he was stopped by RTA police, which was January 31, 2020.  She confirmed where Lewis lived on Harvard Avenue.  Lewis identified the silver car from the still photos as his girlfriend's car.  Lewis told Detective Evans that on the night of January 4, 2020, he was at his girlfriend's house by 10:00 p.m. and never left after that.  He said that no one else drove his girlfriend's car that night.  He denied knowing Franklin.  He denied knowing anything about a Finish Line order

that someone placed with the victim's credit card that was supposed to be delivered to his home on Harvard Avenue.

{¶ 26} When faced with some of the evidence that Detective Evans had, Lewis admitted that he knew Franklin but said that Franklin was a member of the Heartless Felons and was "higher" in the gang than Lewis was, which was why Lewis did not want to talk at first. Lewis said that he met Franklin in prison. Lewis then told Detective Evans that he rented his girlfriend's car to Franklin on December 31, 2019, because they needed money. He said that Franklin had the vehicle for about a week. Lewis denied ever seeing Franklin with a gun. Detective Evans did not arrest Lewis that night.

{¶ 27} Detective Evans asked Lewis to come back for another interview, which he voluntarily did. He brought his girlfriend who owned the silver Dodge. Detective Evans interviewed Lewis's girlfriend first and then Lewis. Detective Evans told Lewis that his girlfriend contradicted his story. Lewis then agreed that he was driving his girlfriend's car that night but said that Franklin came to get it around 10:00 p.m. and that Lewis's girlfriend did not know because Lewis met Franklin outside to give him the keys.

{¶ 28} Detective Evans obtained consent from Lewis and his girlfriend to search their cell phones. After reviewing the cell phones, Detective Evans learned that there were "some Messenger communications" between Lewis and his girlfriend from January 4 and 5, 2020. Detective Evans said that around the time the robbery occurred, Lewis messaged his girlfriend to tell her that he had wrecked

her car.  Based on that information, Detective Evans obtained a search warrant to review Lewis's and his girlfriend's Facebook accounts.

{¶ 29} Detective Evans reviewed Facebook communications between Lewis and his girlfriend.  They began messaging on January 4, 2020, around 6:23 p.m. Lewis and his girlfriend were talking about seeing each other.  At 12:37 a.m. on January 5, 2020, Lewis messaged his girlfriend and said, "I was driving and somebody hit the car, the back, low key f*ck up bae."  Lewis then tells his girlfriend to call him.  Lewis and his girlfriend then argued about the wreck.  At 3:38 a.m., Lewis messaged his girlfriend, "Stop texting Jamie for real.  If you cool, den be cool on me.  I told you I got the money to fix your car.  What do you want me to do[?]"

{¶ 30} After Detective Evans read the Facebook messages between Lewis and his girlfriend, she decided to interview Lewis for a third time.  Detective Evans identified a photo from Lewis's Facebook account of him holding a gun that she said matched the description of the gun the victim had described.  Lewis told Detective Evans that it was not his gun.  Detective Evans confronted Lewis about the Facebook messages and how they show that he was driving his girlfriend's car around the time of the aggravated robbery.  Lewis changed his story again, this time stating that he had been driving around in his girlfriend's car that evening when Franklin called him and asked Lewis to pick him up at his house on Western Avenue.  Franklin told Lewis that he needed money for his "girl."  Lewis said that he gave the car to Franklin and Lewis got out and walked.  Franklin then came back to get Lewis and gave him

some money.  Lewis said he then drove Franklin to a gas station and then took him home.

{¶ 31} After Detective Evans interviewed Lewis, she obtained an arrest warrant to charge Lewis with aggravated robbery and related charges.  She did so based on Lewis's statement in the Facebook messages that he was driving his girlfriend's car around the time of the aggravated robbery.  She also obtained an arrest warrant for Franklin for aggravated robbery, but Franklin was killed before Detective Evans could testify before the grand jury.

{¶ 32} Detective Evans interview Franklin before he was killed.  She said that Franklin was shorter than Lewis and more heavy-set.  Detective Evans said that based on the description that the victim gave police about the person who robbed her, Lewis matched the description better than Franklin.

{¶ 33} On cross-examination, Detective Evans said that she learned that the third person in the car with Franklin and Lewis was someone named "Dray" but police were never able to identify him.  Detective Evans agreed that Franklin used the nickname, "Franko."

{¶ 34} At the close of the state's case, Lewis moved for a Crim.R. 29 acquittal, arguing that the state did not sufficiently establish Lewis's identity in the crimes. The trial court denied Lewis's motion with respect to Counts 1 through 6 but granted it with respect to Counts 7 and 8, which were the identity and telecommunications fraud charges.

{¶ 35} Before issuing the verdict, the trial court explained that it could not determine from the evidence that Lewis "was the actual person who pulled the gun because we don't have an ID," but that Lewis, at a minimum, admitted "that he knew of the incident, he met or provided the car and had been driving the car indeed." The trial court stated that it had a "hunch" that Lewis was driving and committed the offense, but that was "not enough to sustain a verdict beyond a reasonable doubt." The trial court also had a "hunch" that the gun described by the victim was the same one that Lewis was holding in the Facebook photo, but that was not enough to sustain a verdict beyond a reasonable doubt. The trial court stated that according to Lewis's own words, "he described his willingness and ability and his cooperation in providing the use of the car. He knew what the plan was." Based on this evidence, the trial court found that the state proved beyond a reasonable doubt that Lewis was "an aider or abettor" in the crimes and therefore was complicit in the aggravated robbery or was an accomplice "in so far as he knowingly assisted and joined another in the commission of a crime."

{¶ 36} The trial court found Lewis not guilty of Count 1, aggravated robbery, and Counts 4 and 5, the weapons while under disability charges. It found him guilty of Count 2, robbery but not guilty of the attached firearm specifications; Count 3, robbery without the firearm specifications but guilty of the notice of prior conviction and repeat violent offender specifications; and Count 6, theft.

{¶ 37} Prior to sentencing, the trial court found that Counts 2, 3, and 6 were allied offenses of similar import and merged for purposes of sentencing. The state

elected to proceed on Count 2, robbery, which was a second-degree felony. The trial court sentenced Lewis to six years of mandatory prison time. The trial court further notified Lewis that he would be designated a violent offender pursuant to R.C. 2903.41 and that he would be subject to three years of mandatory postrelease control upon his release from prison. The trial court also imposed court costs. It is from this judgment that Lewis now appeals.

## II. Sufficiency and Manifest Weight of the Evidence

{¶ 38} In his first and second assignments of error, Lewis argues that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶ 39} "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), paragraph two of the syllabus. As a matter of appellate review, they involve different means and ends. *Id.* at 386-389. They also invoke different inquiries with different standards of review. *Id.*; *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). The difference, in the simplest sense, is that sufficiency tests the burden of production while manifest weight tests the burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

{¶ 40} A sufficiency challenge essentially argues that the evidence presented was inadequate to support the jury verdict as a matter of law. *Id.* at 386. "'The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt.'" *State v. Getsy*, 84 Ohio St.3d 180, 193, 702 N.E.2d 866 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "[A] conviction based on legally insufficient evidence constitutes a denial of due process." *Thompkins* at 386, citing *Tibbs v. Florida*, 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). When reviewing a challenge to the sufficiency of the evidence, we review the evidence in a light most favorable to the prosecution. *State v. Hill*, 75 Ohio St.3d 195, 205, 661 N.E.2d 1068 (1996).

{¶ 41} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, at 387. Because it is a broader review, a reviewing court may determine that a judgment of a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 124 N.E.2d 148 (1955).

{¶ 42} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.*, 78 Ohio St.3d at 387, 678 N.E.2d 541. In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine "'whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new

trial should be reserved for only the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Id.* quoting *Martin.*

{¶ 43} In his first assignment of error, Lewis argues that the state failed to prove that he aided and abetted Franklin.

{¶ 44} R.C. 2923.03(A)(2) provides that "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense." A charge of complicity may be stated in terms of the complicity statute or in terms of the principal offense. R.C. 2923.03(F). To prove complicity by aiding and abetting, the state had to prove beyond a reasonable doubt "that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal. Such intent may be inferred from the circumstances surrounding the crime." *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796 (2001), syllabus. The criminal intent of the aider and abettor "can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed." *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13, citing *Johnson.*

{¶ 45} Lewis argues that the state failed to present any evidence that he helped, assisted, encouraged, or strengthened Franklin's robbery of the victim. He states that "[i]t is clear that [he] played no part in the robbery and did nothing to encourage or incite [Franklin] into robbing" the victim. He argues that "[m]erely being present is insufficient to demonstrate complicity." He further argues that the

state's evidence demonstrated that Franklin was the only one who benefited financially from the robbery, not Lewis.

{¶ 46} As with proof of any element of an offense, complicity may be proven by circumstantial evidence, which has the same probative value as direct evidence. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus. Here, the state presented evidence that Lewis had been driving his girlfriend's car at the time of the robbery and that around the same time, another car had hit her silver Dodge. Lewis messaged his girlfriend at 12:37 a.m. on January 5, 2020, to tell her about the accident. The state established that someone called 911 at 1:00 a.m. on January 5, 2020, to report the robbery. The victim stated that she had blacked out when she was hit and then had to walk to get help, so the exact time of the robbery could not be determined.

{¶ 47} The state also presented evidence from surveillance cameras that three people were in the silver car. The victim saw that the driver's side door was open when she was robbed but admitted that she did not see which side of the vehicle the robber came from or went back to. Lewis admitted to police that he was driving his girlfriend's car around the time of the robbery and that he was with Franklin. Lewis also admitted that he knew that Franklin intended to "make money." Further, around 3:30 a.m., Lewis messaged his girlfriend that he had money to fix her car. Lewis's address was also used when someone placed an online order with the victim's credit at Finish Line approximately one hour after the robbery.

**{¶ 48}** After review, we conclude that the state presented sufficient evidence to prove that Lewis aided and abetted Franklin in robbing the victim. Lewis's first assignment of error is without merit.

**{¶ 49}** With respect to Lewis's second assignment of error that his convictions were against the manifest weight of the evidence, Lewis essentially makes the same arguments regarding aiding and abetting that he did with sufficiency of the evidence. He further argues that because the email used for the online order at Finish Line was associated with Franklin and that the victim testified that her stolen phone pinged on the street where Franklin lived, that evidence established that Franklin acted alone.

**{¶ 50}** Reviewing this case as if we were the fact finder, we do not agree with Lewis that the trial court clearly lost its way when determining that he was guilty of aiding and abetting Franklin. Lewis changed his story multiple times when talking to police. He first stated that he had his girlfriend's car but that he rented it to Franklin and was home with his girlfriend on the night of the robbery. But when Detective Evans confronted Lewis that he could not have been with his girlfriend because he was messaging her at the time of the robbery, he admitted he had picked Franklin up in his girlfriend's car and that Franklin told him that he wanted to make some money, but that Franklin got out of the car, and he had no idea what Franklin was doing.

**{¶ 51}** After conducting in independent review of the record, weighing the evidence and all reasonable inferences, and considering the credibility of the

witnesses, we conclude that it was not against the manifest weight of the evidence for the trial court to believe the state's theory that Lewis aided and abetted Franklin in robbing the victim. Although it is possible that Franklin could have been the sole person who ordered shoes from Finish Line and had separate online orders shipped to his house and Lewis's house as Lewis argues, it is more likely that Lewis placed the order himself to benefit from the victim's stolen credit card as well.

{¶ 52} We note that although we are required to independently weigh the evidence, including the credibility of the witnesses, the Ohio Supreme Court made clear that we "must always be mindful of the presumption in favor of the finder of fact." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 21, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 461 N.E.2d 1273 (1984) (although *Eastley* was a civil case, the Supreme Court thoroughly discussed sufficiency and manifest weight of the evidence reviews in civil and criminal cases and concluded that the reviews are the same whether the case is civil or criminal).

{¶ 53} Accordingly, we find that this is not the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin,* 20 Ohio App.3d at 175, 485 N.E.2d 717. We therefore overrule Lewis's second assignment of error.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, ADMINISTRATIVE JUDGE

SEAN C. GALLAGHER, J., and
LARRY A. JONES, SR., J., CONCUR